Filed 1/13/26  In re A.L. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.L., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,  Plaintiff and Respondent,  v.  Ar.L.,  Defendant and Appellant. | D086790  (Super. Ct. No. NJ15947) |

APPEAL from an order of the Superior Court of San Diego County, Alejandro Morales, Judge.  Conditionally reversed and remanded with directions.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

David J. Smith, Acting County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Indra N. Bennett, Deputy County Counsel, for Plaintiff and Respondent.

Ar.L. (Father) appeals from the juvenile court's order following a Welfare and Institutions Code[1] section 366.26 hearing terminating his parental rights as to A.L. (Child) and ordering a permanent plan of adoption. Father asserts the San Diego County Health and Human Services Agency (Agency) failed to comply with its duty of further inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and Welfare and Institutions Code section 224.2 in its inquiries to certain tribes and the Bureau of Indian Affairs (BIA). While the Agency repeatedly contacted the relevant tribes based on information provided by Child's relatives, some tribes did not respond to the inquiries, and the Agency did not have substantive communication with the BIA. Father raises 25 Code of Federal Regulations part 23.105(c), which provides that the Agency "should seek assistance in contacting the Indian Tribe from the BIA" if "the Tribe contacted fails to respond to written inquiries."

We conclude that the Agency adequately inquired with the relevant tribes but was required to seek assistance from the BIA when tribes failed to respond to its inquiries. Accordingly, we conditionally reverse the juvenile court's order and remand the matter with directions to the Agency to request assistance from the BIA, subject to reinstatement if the juvenile court determines there is no reason to know Child is not an Indian child after that inquiry.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

FACTUAL AND PROCEDURAL BACKGROUND

A. *Overview of Proceedings*

In January 2024, the Agency filed this juvenile dependency petition on behalf of five-year-old Child after mother passed away, Father was arrested, and Child had an untreated infection on her face and tested positive for fentanyl. Child was detained and placed with maternal relatives out of the county. The court made a true finding on an amended petition in April 2024, maintaining Child's placement.[2]

Father completed some services by the time of the six-month review hearing in October 2024. Shortly thereafter, the Agency lost contact with Father. At the time of the contested 12-month review hearing in April 2025, the Agency still had no contact with Father despite active efforts, and he had not consistently had contact with Child. At the Agency's recommendation, the juvenile court terminated reunification services and set a section 366.26 hearing. On September 4, 2025, the court held a section 366.26 hearing, terminating parental rights and ordering a permanent plan of adoption.

B. *ICWA*

At the beginning of the case, Father reported membership in the Juaneño Band of Mission Indians (Juaneño Band). Two paternal aunts also confirmed this heritage. Even though that tribe is not federally recognized, the juvenile court requested the Agency notice the tribe of the proceedings to permit their input in the spirit of ICWA.

Maternal family also reported possible Native American ancestry. Maternal grandmother reported that, while she was not enrolled in any tribe

---

2     The juvenile court initially made that placement on an emergency basis. When the court maintained that placement as in Child's best interest, Father appealed the juvenile court order making the out-of-county placement, and we affirmed. (*In re A.L.*, (Oct. 7, 2024, D083945) [nonpub. opn.].)

and did not participate in tribal events, her mother was born and raised on a reservation, possibly Cherokee or Yaqui. At the detention hearing, maternal uncle also reported possible but unconfirmed Native American heritage. The court ordered the Agency to investigate whether Child was an Indian child.

After these initial reports, the Agency followed up with Father, paternal aunts, paternal cousin, maternal uncle, maternal grandmother, maternal great uncle in February 2024. Father and paternal aunts again reported being part of the Juaneño Band, as did paternal cousin. Paternal cousin stated they are not enrolled in the tribe.

Maternal uncle stated he heard of Native American ancestry through Child's maternal great-grandmother, who mentioned the Cherokee, Yaqui, and Blackfeet tribes, but the heritage had not been confirmed. Maternal grandmother reported that maternal great-grandmother lived on a reservation until she was five years old, but maternal grandmother did not know the name of the tribe and stated "there is no proof" of the heritage. The Agency confirmed maternal great-grandmother's name and birthday. Maternal uncle and grandmother both stated no family member was enrolled in a tribe, received assistance from a tribe, or participated in tribal activities. Maternal great uncle also reported that maternal great-grandmother lived on a reservation, and he had heard of Cherokee and Blackfeet heritage.

Based on that information, on February 7, 2024, the Agency initiated informal inquiry to: (1) the Eastern Band of Cherokee Indians (Eastern Band) by emailing an encrypted letter and mailing a certified letter; (2) the Cherokee Nation by emailing an encrypted letter and mailing a certified letter; (3) the United Keetowah Band of Cherokee Indians in Oklahoma (United Keetowah Band) by emailing an encrypted letter and mailing a certified letter; (4) the Pascua Yaqui Tribe of Arizona (Yaqui Tribe) by

4

emailing an encrypted letter and mailing a certified letter; (5) the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana (Blackfeet Tribe) by emailing an encrypted letter and mailing a certified letter; (6) the Juaneño Band by mailing a certified letter; and (7) the BIA by mailing a certified letter.

On February 16, 2024, the Agency received a letter from the BIA stating, "We are returning your letter of inquiry due to insufficient information to determine tribal affiliations or you have not identified a tribe."

On February 27 and 28, 2024, the Agency followed up by phone and email with the Yaqui Tribe, Eastern Band, Cherokee Nation, United Keetowah Band, and Blackfeet Tribe. On February 29, 2024, the Agency sent an email follow up to the Juaneño Band.

On March 27, 2024, either the Eastern Band or the Yaqui Tribe responded that Child was not enrolled or eligible to be enrolled in the tribe.[3] On March 28, 2024, the Agency confirmed over the phone that Child was not a member or eligible to be a member of the United Keetowah Band.

On March 27 and 28, 2024, the Agency followed up by phone and email with the Yaqui Tribe, Cherokee Nation, and Blackfeet Tribe. The Agency did not make any additional inquiries after March 2024. The Agency did not receive any response regarding Child's membership in, at a minimum, the Cherokee Nation and the Blackfeet Tribe.

On March 29, 2024, the Agency received a letter from the Juaneño Band stating Child, Child's mother, Father, and maternal great-grandmother were not on their tribal roll or in their files as enrolled members or descendants.

---

[3]    At different points in the record, the same email denying enrollment is attributed to both tribes.

Unlike its efforts with the tribes, the Agency did not follow up with the BIA. At the April 2024 jurisdiction and disposition hearing, the Agency and the juvenile court discussed their understanding that the BIA's response letter meant that Child's, Child's Mother's, Father's, and maternal great-grandmother's information was insufficient for the BIA to make a determination without the names of specific tribes. The Agency contended "that regardless of the [BIA]'s response, that the more specific inquiry to the specific tribes . . . is sufficient for the court to [find ICWA did not apply]." Father's counsel submitted. The court found the Agency had conducted an adequate further inquiry into which tribes Child may be a member or eligible for membership and to verify membership with those tribes. The court concluded there was no reason to know Child was an Indian child. The court stated: "The Agency is to respond back to the [BIA] with those specific tribal names just to confirm, but I'm prepared to move forward today, nonetheless . . . ." Still, the Agency did not do so.

At the subsequent six- and 12-month review hearings, with no additional information, the juvenile court found ICWA did not apply.

DISCUSSION

Father contends the Agency failed to make an adequate further inquiry because it did not attempt to contact the Cherokee Nation or the Blackfeet Tribe after March 2024 and did not follow up with the BIA after the April 2024 hearing. We conclude substantial evidence supports the juvenile court's finding that the Agency complied with its duty of further inquiry as to the tribes, but the Agency should have contacted the BIA when it did not receive responses from tribes.

Congress enacted ICWA to address concerns regarding the separation of children with Native American ancestry from their tribes through adoption

6

or foster care placement with non-Native American families. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) The juvenile court and the Agency have an affirmative and continuing duty to inquire whether a dependent child "is or may be an Indian child" in all dependency proceedings. (§ 224.2, subd. (a).)

California's current statutory scheme contains "three distinct duties regarding ICWA in dependency proceedings." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*D.S.*).) First, from the Agency's initial contact with the minor and her family, the statute imposes a duty of inquiry to ask all involved persons, including extended family members as defined in the statutes and others with an interest in the child, whether the child may be an "Indian child." (25 U.S.C. § 1903(2); Welf. & Inst. Code, §§ 224.1, subd. (c)(1), 224.2, subds. (a), (b).) Second, if the initial inquiry creates a "reason to believe" the child has Native American ancestry, the Agency is required to "make further inquiry regarding the possible Indian status of the child . . . as soon as practicable" to "determine whether there is reason to know a child is an Indian child." (§ 224.2, subd. (e).) "Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply." (*D.S., supra*, at p. 1052.)

In this case, it is undisputed that there was "reason to believe" Child was an Indian child. Father's appeal challenges whether the Agency satisfied the second duty, that of further inquiry. As previously summarized by this court: "When the Agency has a reason to believe a child is an Indian child, as in this case, it must satisfy three requirements. First, the Agency must interview the parents, Indian custodian, and extended family members to gather relevant information, specified by statute, regarding the details of the child's birth, family members, and possible tribal affiliations. (§ 224.2, subd. (e)(1); see also § 224.3, subd. (a)(5).) Second, the Agency must contact

7

'the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership in, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility.' (§ 224.2, subd. (e)(2).) Third, the Agency must contact 'the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.' (*Id.*, subd. (e)(3).) The Agency's contact with the tribe 'shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case.' (*Ibid.*)" (*D.S., supra*, 46 Cal.App.5th at pp. 1052–1053.) "Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under the federal Indian Child Welfare Act of 1978 (25 U.S.C. Sec. 1901 et seq.)." (§ 224.2, subd. (e)(2)(C).)

"If the court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that the federal Indian Child Welfare Act of 1978 (25 U.S.C. Sec. 1901 et seq.) does not apply to the proceedings, subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) Where the facts are undisputed, however, we independently determine whether ICWA's requirements have been satisfied. (*D.S., supra*, 46 Cal.App.5th at p. 1051.)

The record demonstrates the Agency diligently contacted the Cherokee Nation and the Blackfeet Tribe. The social worker contacted the Cherokee Nation as follows: by email on February 7, 2024; by mail on February 7,

2024; by phone on February 27, 2024; by email on February 28, 2024; by phone on March 28, 2024, including leaving a voicemail for a supervisor regarding how much longer the inquiry would take; and by email on March 28, 2024. As to the Blackfeet Tribe, the social worker contacted the tribe as follows: by email on February 7, 2024; by mail on February 7, 2024; by phone on February 27, 2024; by email on February 28, 2024; by email on March 28, 2024; and by phone on March 28, 2024. The social worker received an email back with the phone number of the "ICWA Inquiry Tech"; in the March 28, 2024, phone call, the social worker called that number and left a voicemail asking for an update on the inquiry regarding Child. An "adequate further inquiry and due diligence" (§ 224.2, subd. (i)(2)) required no further action by the Agency after numerous attempts to contact the tribes using multiple methods of communication. (See *In re H.M.* (2025) 109 Cal.App.5th 1171, 1183–1184 (*H.M.*); *D.S., supra*, 46 Cal.App.5th at p. 1054.) "The Agency is not required to 'cast about' for information or pursue unproductive investigative leads." (*D.S.*, at p. 1053.)

However, when the tribes did not respond to the Agency's written inquiries, and pursuant to the juvenile court's direction, the Agency should have contacted the BIA to "seek assistance in contacting the Indian Tribe[s]." (25 C.F.R. § 23.105(c); § 224.2, subd. (e)(2)(B).) Accordingly, we must conditionally reverse and direct the Agency to comply with that requirement. *H.M.*, cited by the Agency, does not compel a different conclusion. There, "the department successfully contacted all three federally recognized Cherokee tribes, *and the tribes responded* to the department's inquiries." (*H.M., supra,* 109 Cal.App.5th at p. 1184, italics added.) Here, it is undisputed that not all tribes responded.

9

DISPOSITION

We conditionally reverse the juvenile court's order terminating Father's parental rights. On remand, the Agency shall seek assistance from the BIA in contacting the tribes that did not respond to its written inquiries.

If, after requesting assistance from the BIA and completing an inquiry based on that assistance or learning the BIA is unable to assist, neither the Agency nor the juvenile court has reason to know that Child is an Indian child, the order terminating parental rights to Child shall be reinstated. Alternatively, if the Agency or the juvenile court has reason to know Child is an Indian child, the court shall proceed according to statute.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

KELETY, J.